UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

William L. Saulnier

     v.                           Civil No. 19-cv-546-JL
                                       Opinion No. 2020 DNH 075
Commissioner of the
U.S. Social Security Administration


**ORDER ON APPEAL**

William L. Saulnier has moved to reverse the Social Security Administration's ("SSA") decision to deny his application for a period of disability and disability insurance benefits.[1]  An administrative law judge ("ALJ") found that Saulnier, despite severe impairments, retains the residual functional capacity ("RFC") to perform light exertional work, subject to certain limitations, and thus is not disabled as defined by law.  See 20 C.F.R. § 404.1505(a).  The Appeals Council affirmed this decision, rendering it final.  See id. § 404.981.  Saulnier then appealed to this court, which has jurisdiction under 42 U.S.C. § 405(g) (Social Security).  On appeal, Saulnier asserts that the ALJ erred in finding Saulnier's impairments did not meet or clear required severity thresholds.  See L.R. 9.1(b).  The SSA Commissioner disagrees and has cross-moved for an order affirming the ALJ's decision.[2]  See L.R. 9.1(e).

The court finds that the ALJ's final decision is supported by substantial evidence.  It thus denies Saulnier's motion to reverse and grants the Commissioner's cross-motion to affirm.

---

[1] Saulnier Mot. to Reverse (doc. no 7).

[2] Comm'r Mot. to Affirm (doc. no. 9).

## I.   **Background**

In July 2018, an ALJ followed the established five-step sequential evaluation process, see 20 C.F.R. § 404.1520, and found that Saulnier is not disabled under section 216(i) and 223(d) of the Social Security Act.

At Step 1, the ALJ found that Saulnier had not engaged in substantial gainful activity from his alleged onset date of September 4, 2014 through his date last insured of September 30, 2015.[3]

At Step 2, the ALJ found that Saulnier had five severe impairments that significantly limit his ability to perform basic work activities—cervical degenerative disc disease, status post fusion, ischemic heart disease, cognitive disorder, and anxiety.[4]

In doing so, the ALJ declined to find that Saulnier's alleged lumbar degenerative disc disease/spondylosis, carpal tunnel syndrome, and fibromyalgia constituted severe impairments because there were "no significant objective medical findings in the record to support" such severity for the period prior to the date Saulnier was last insured.[5]  For carpal tunnel syndrome, the ALJ specifically noted that while there was evidence documenting the impairment in more recent medical records, an impartial medical expert opined that these records, created after the date last insured, provided "insufficient evidence to determine what, if any limitations it may have caused" during the relevant period.[6]  The ALJ also observed that if it was true that Saulnier's carpal tunnel syndrome was a "long-standing condition," then Saulnier was able to work for many years with the

---

[3] Admin. R. at 23-24.

[4] Id. at 24 (citing 20 C.F.R. § 404.1520(c)).

[5] Id.

[6] Id. (citing Admin. R. at 804-09).

condition in his construction and maintenance jobs.[7]  Despite finding insufficient

evidence supporting carpal tunnel syndrome as a severe impairment, the ALJ "included

limitations in the residual functional capacity assessment . . . for frequent handling and

fingering in light of the reference to his orthopedic doctor to the long-standing

condition."[8]

　　For lumbar degenerative disc disease, the ALJ noted that although medical records

showed Saulnier aggravated the impairment a few weeks before a March 30, 2016

physician's visit, his physician found no neurological problems and did not believe it

warranted a MRI.[9]  Additionally, the ALJ found that there was minimal other evidence of

low back pain prior to the date last insured.[10]

　　At Step 3, the ALJ found that Saulnier's impairments, considered both individually

and in combination, did not meet or medically equal the severity criteria of an

impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, including Listings 1.04

(disorders of the spine); 12.02 (neurocognitive disorders); 4.00 (cardiovascular

disorders), and 12.04 (depressive, bipolar, and related disorders).[11]  In making a

determination for Listing 12.04, the ALJ applied the familiar "Paragraph B" criteria and

found that Saulnier had (1) moderate limitations in understanding, remembering, or

---

[7] Id.  The ALJ observed there was a later treatment note observing that "there was a positive EMG many years ago, but the record was too old to obtain."  Id.

[8] Id.

[9] Id. at 25 (citing Admin. R. at 797-800).

[10] Id.  The ALJ also noted that the impartial medical expert, Dr. Urbaniak, opined that the objective medical evidence supported only a loss of range of motion, but not substantially reduced functional limitations recommended by Saulnier's treating physician, Dr. Salerni.  Id.

[11] Id. at 25-28.

applying information; (2) mild limitations in interacting with others; (3) moderate limitations in concentrating, persisting, or maintaining pace; and (4) moderate limitations in adapting or managing himself.[12]

After considering the entire record, the ALJ ultimately concluded that Saulnier retains the residual functional capacity to perform light work, subject to additional postural and environmental limitations, including a limitation to no overhead reaching and only frequent handling and fingering bilaterally.[13]  In making this finding, the ALJ evaluated the intensity, persistence, and limiting effects of Saulnier's symptoms, as reflected in his testimony, medical opinion and treatment notes, and other objective evidence in the record.  This included a consideration of Saulnier's daily life activities, his work history, his testimony regarding his anxiety, dizziness, and pain, and the corroborating testimony of Saulnier's wife.[14]

The ALJ also evaluated whether Saulnier's impairments, either individually or in combination, rendered Saulnier disabled.  The ALJ found that although Saulnier's "medically determinable impairments could reasonably be expected to cause [his] alleged symptoms," Saulnier's "statements concerning the intensity, persistence[,] and limiting effects of these symptoms [we]re not entirely consistent with the medical evidence and other evidence in the record . . . ."[15]

---

[12] Id. at 27.

[13] Id. at 28.

[14] Id. at 28-29.

[15] Admin. R. at 30; see also id. at 30-34 (summarizing how the record showed mild, but not disabling functional limitations).

At Step 4, the ALJ found that through the date last insured, Saulnier was unable to perform any relevant past work.[16]

At Step 5, the ALJ found, based on the testimony of a vocational expert, that Saulnier, given his age, education, work experience, and residual functional capacity, can perform jobs that exist in significant numbers in the national economy, including sorter, usher, and cashier.[17]  Under this framework, the ALJ concluded that a finding of "not disabled" was appropriate.

## II.   <u>Applicable legal standard</u>

In reviewing a challenge of a final determination by the SSA, the court "defer[s] to the [ALJ]'s findings of fact, so long as they are supported by substantial evidence," Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000), that is, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," Richardson v. Perales, 402 U.S. 389, 401 (1971) (quotations omitted).  Though the evidence in the record may support multiple conclusions, the court must still uphold an ALJ's findings "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support h[er] conclusion."  Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991).  "[I]ssues of credibility and the drawing of permissible inference from evidentiary facts are the prime responsibility of the [ALJ]."  Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981) (per curiam).  Reversal is warranted only if the ALJ committed a legal or factual

---

[16] <u>Id.</u> at 36.

[17] <u>Id.</u> at 37.  The vocational expert testified, based on his professional experience and observations working in the field, that cashier jobs existed that did not require overheard reaching.  <u>Id.</u>

error in evaluating plaintiff's claim, see Manso-Pizarro v. Sec'y of Health & Human Servs., 76 F.3d 15, 16 (1st Cir. 1996) (per curiam) (quoting Sullivan v. Hudson, 490 U.S. 877, 885 (1989)), or if the record contains no "evidence rationally adequate . . . to justify the conclusion" of the ALJ.  Roman–Roman v. Comm'r of Soc. Sec., 114 Fed. Appx. 410, 411 (1st Cir. 2004).

## III.    Analysis

On appeal, Saulnier asserts that ALJ made four errors, each of which warrants reversal or remand.  First, he contends that the ALJ failed to base Saulnier's mental and physical RFC on substantial evidence in the record.  Second, he argues that the ALJ improperly discounted the opinion of his treating physician, Dr. Salerni, by not giving Dr. Salerni's expert opinion controlling weight.  Third, he asserts the ALJ improperly discounted his and his wife's testimony describing his pain and disability.  Finally, he contends that the ALJ erred in finding that jobs existed for Saulnier in the national economy because the jobs identified by the vocational expert were inconsistent with the ALJ's hypotheticals.  As discussed below, none of these arguments persuade the court that the ALJ committed a reversible error.

### A.    RFC Assessment

Saulnier first contends that the ALJ failed to base his mental and physical RFC on substantial evidence in the record and that, in assessing an RFC, misrepresented or ignored record evidence.  At Step 3, the ALJ found that Saulnier "had the residual functional capacity to perform light work."[18]  This RFC included the mental assessment that Saulnier be "limited to work involving simple, routine tasks, with only occasional

---

[18] Admin. R. at 30.

changes in the work setting, occasional simple decisionmaking, and no fast-paced work or high production quotas," as well as postural and environmental limitations for Saulnier's mental and physical symptoms.[19]  As discussed below, these mental and physical assessments were supported by substantial evidence in the record and were not the product of misrepresented evidence.  On this basis, remand is not warranted.

### 1.    Mental RFC

Saulnier argues that the ALJ's mental RFC assessment was flawed in essentially two regards.  First, he contends that the ALJ's mental RFC assessment conflicts with the greater limitations described in his and his wife's testimony.  This does not constitute reversible error.  "[T]he extent to which an individual's statements about symptoms can be relied upon as probative evidence in determining whether the individual is disabled depends on the credibility of the statements."  Social Security Ruling ("SSR") No. 96–7p, 1996 WL 374186, at *4 (July 2, 1996).  Assessing witnesses' credibility and resolving conflicts of evidence are matters for the ALJ, not a court in review.  See Irlanda Ortiz, 955 F.2d at 769.  The ALJ's determinations in these matters are entitled to deference so long as they are supported by substantial evidence in the record.  Id.; Pettigrew v. Astrue, No. 11-CV-167-PB, 2011 WL 5282640, at *7 (D.N.H. Nov. 1, 2011).

Although Saulnier and his wife collectively testified that Saulnier suffered from extreme limitations such as an almost total inability to do household chores, the ALJ properly found that these reports were undercut by other evidence in the record.  For example, the ALJ noted that Saulnier "perform[ed] some part-time property management work in 2014, and if [he] were as limited in cognitive functioning as he testified . . . , it is

---

[19] Id.

unlikely he would have even attempted such work."[20]  The ALJ also observed that
Saulnier's medical records reflected that Saulnier could still do independent daily living
activities, such as pay bills and grocery shop.[21]  Although Saulnier's testimony differed at
times from other evidence in the record, it was squarely within the ALJ's province to
resolve these conflicts of evidence.  See Irlanda Ortiz, 955 F.2d at 769.  And the evidence
in the record as a whole adequately supports the ALJ's conclusion.

Second, Saulnier asserts that the mental RFC assessment conflicts with a
March 2015 neuropsychological evaluation administered by his treating physician,
Dr. Nicholls.  In Saulnier's view, the ALJ, in summarizing Dr. Nicholls's evaluation,
"listed all the sections . . . where [Saulnier] did well," but "minimize[ed] those portions
where he did poorly."[22]  This purportedly included minimizing Dr. Nicholls's
documentation of Saulnier's declining ability to hold attention for long periods of time,
visual prowess, and reading comprehension skills, which were based in part on reports by
Saulnier and his wife.[23]

---

[20] Admin. R. at 32.  Saulnier argues that he should not be penalized for his part-time work
attempt because it purportedly was an unsuccessful work attempt.  Saulnier Mot. to Reverse
Mem. (doc. no. 7-1) at 9.  But as the Commissioner notes, Saulnier told Dr. Nazeer in December
2015 that he was working 7-days a week, see Admin. R. at 599, and also told Dr. Farah in March
2016 that he currently worked as a carpenter, see id. at 688.

[21] Id.; see also id. at 540-41.  The Commissioner's motion to affirm also highlights other portions
of the administrative record, which the ALJ did not specifically incorporate into the final
decision, that undercut Saulnier's reports about the severity of his mental symptoms.  See
Comm'r Mot. to Affirm Mem. (doc. no. 9-1) at 7-8.

[22] Saulnier Mot. to Reverse Mem. at 6 (citing Admin. R. at 31-32).

[23] See also Saulnier Mot. to Reverse Mem. at 6 ("Included in Dr. Nicholls' report were several of
Plaintiff's complaints . . . ."); id. ("This need for clarification and reminders is substantiated by
Dr. Nicholl's report and by Plaintiff's statements to him."); Admin. R. at 540-43.

Taken on their face,[24] these critiques fail to establish that the ALJ's mental RFC assessment was unsupported by substantial evidence.  In assessing Saulnier's mental limitations, the ALJ relied on (in addition to Dr. Nicholls's opinion) the impartial medical expert opinion of Dr. Claiborn, PhD, which the ALJ gave "great weight."[25]  After reviewing Dr. Nicholls's testing and the entirety of the medical record at the time, Dr. Claiborn opined that Saulnier had mild to moderate limitations for each of the criteria in Listings 12.02 and 12.06, see 20 CFR 404.1-20(d), 404.1525 and 404.1526.  Further, he opined that:

- Saulnier was limited to simple, repetitive tasks and not performing the task at a high pace and limited to occasional changes;

- Saulnier would be limited from complex tasks, and would have difficulty adapting to changes and taking in new information and recalling it;

- Saulnier's anxiety was in the mild to moderate range; and

- Saulnier's memory testing reflected mixed memory functioning, with some memory problems.[26]

This medical opinion and mental RFC assessment constitute substantial evidence that supports and is consistent with the ALJ's mental RFC.

Additionally, the ALJ's mental RFC assessment is not inconsistent with Dr. Nicholl's 2015 assessment of Saulnier's mental symptoms.  Despite Saulnier's

---

[24] The court does not find that the ALJ did not consider the bulk of Dr. Nicholls testimony.

[25] The ALJ gave Dr. Claiborn's opinion "great weight" because of his medical expertise, his knowledge of Social Security disability regulations, and his unique position of having the opportunity to listen to the testimony of Saulnier's wife and to review all of the relevant medical records through the date of the hearing.  Admin. R. at 33-34.

[26] Id. at 34.

arguments to the contrary, the ALJ gave "great weight" to Dr. Nicholls's opinion and considered the portions of Dr. Nicholls's reports where Saulnier "did poorly."[27]  For example, the ALJ considered Dr. Nicholls finding that Saulnier "may become overwhelmed or need to go over . . . new information a few times," and that "his anxiety may be impacting in his abilities to process and retrieve new information."[28]

Dr. Nichol's October 16, 2016 letter,[29] tendered after the ALJ's decision, does not alter this analysis.  An ALJ cannot "ma[k]e a mistake" by ignoring new evidence that was never presented to her.  Mills v. Apfel, 244 F.3d 1, 6 (1st Cir. 2001).  As such, federal courts may "remand for further proceedings" based on new evidence only if that evidence "is material and good cause is shown for the failure to present it on a timely basis."  Id. (emphasis added).  Here, however, Saulnier has not shown how Dr. Nichol's letter is timely.  In Saulnier's words, the letter "interprets" Dr. Nichol's 2015 evaluation and explains why Saulnier cannot perform the jobs identified by the vocational expert.[30]  But, Saulnier never explains why Dr. Nicholls could not have submitted a finer point to his 2015 report or speak on other issues in Saulnier's case before the ALJ made her final decision.  See Evangelista v. Sec'y of Health & Human Servs., 826 F.2d 136, 140 (1st Cir. 1987) ("If a losing party could vault the 'newness' hurdle of § 405(g) merely by retaining an expert to reappraise the evidence and come up with a conclusion different from that reached by the hearing officer, then the criterion would be robbed of all meaning."); Lisi v. Apfel, 111 F. Supp.  2d 103, 110 (D.R.I. 2000) ("It is difficult to see

---

[27] Id.

[28] Id.

[29] See id. at 255-56.

[30] Saulnier Mot. to Reverse Mem. at 7.

how a piece of evidence manufactured after a denial of benefits, which is based in part on information contained in the prior record and which conveniently contradicts a critical conclusion of the Commissioner, can be considered 'new' for purposes of a remand.").

### 2.    Physical RFC

Saulnier's arguments concerning the ALJ's physical RFC are similarly unpersuasive.  At the core of his argument, Saulnier challenges the ALJ's reliance on the testimony of Dr. Urbaniak, a non-treating, non-examining medical witness, over the testimony of Dr. Salerni, a primary care provider who treated Saulnier intermittently between 2012 and 2017, in concluding that Saulnier can perform a reduced range of light work activities.  Focusing on Dr. Urbaniak's disagreements with Dr. Salerni, Saulnier contends that Dr. Urbaniak's "opinions were not based on substantial evidence, and in some cases, not on any evidence, but on assumption."[31]  As such, Saulnier argues that the ALJ erred by relying on Dr. Urbaniak's opinion and, further, that the ALJ erred by rendering a judgment contrary to the greater physical limitations referenced in Dr. Salerni's opinion, the only remaining medical opinion after excluding Dr. Urbaniak's.

But, as the Commissioner notes, the ALJ relied on not just Dr. Urbaniak's opinion, but the treatment notes and opinions from several medical experts who provided opinions or records for Saulnier's Social Security disability determination.  Evangelista, 826 F.2d at 144 (explaining that the ALJ is entitled "to piece together the relevant medical facts from the findings and opinions of multiple physicians.").  She gave great weight to the opinion of Dr. Shilling, another impartial medical expert, who opined that "there would be no physical exertional limits due to [Saulnier's] cardiac condition, in light of [Saulnier's] objective cardiac testing," other than a limit from heavy exertional work and

---

[31] Admin. R. at 31.

extreme environmental hazards.[32] She observed that after Saulnier's accident in 2014, Saulnier told Dr. O'Brien that he was not experiencing any neck pain or stiffness, and could "move his arms and hips without any difficulty other than [minimal] pain."[33] She noted the normal physical and neurological findings from Dr. Suranyi's examinations in December 2014 and June 2105, which included findings of normal reflexes, gait, and sensation.[34] She even considered Dr. Salerni's 2014 treatment notes stating that Saulnier's cervical MRI and CT scans looked favorable. [35]

Saulnier does not address these supporting records. Nor does he point to objective evidence (outside of Dr. Salerni's records) that shows Saulnier suffered exertional limits greater than those identified by the ALJ's physical RFC. (And as discussed below, the ALJ properly found that parts of Dr. Salerni's opinion were inconsistent with the objective medical evidence in the record. See Part III.B, infra.) Thus, even if the court found that Dr. Urbaniak's opinion was unreliable, Saulnier has still failed to show that the ALJ's RFC limiting him to the light exertional level is unsupported by objective record evidence. See, e.g., Pereira v. Berryhill, No. 16-cv-11855, 2017 WL 3567515, at *7-8 (D. Mass. Aug. 17, 2017) (emphasizing that the plaintiff bears the burden of proving a more restrictive RFC and that, in the absence of a functional assessment by a medical expert, an ALJ can base an RFC on treatment records and daily living activities).

---

[32] Id. at 33 (summarizing Dr. Shilling's testimony at Admin. R. 97-106); id. (also noting Dr. Shilling's opinion that Saulnier's reported dizziness was unrelated to his cardiac condition).

[33] Id. at 30-31 (citing Admin. R. at 523-24).

[34] Id. at 31 (citing Admit. R. at 549-50, 561-62).

[35] See id. at 30 (citing. Admin. R. at 510-513).

Regardless, the court does not find that the alleged inconsistencies between Dr. Urbaniak and Dr. Salerni's testimony identified by Saulnier render either medical expert's opinion inherently unreliable. Although Dr. Salerni, as Saulnier's surgeon, opined that Saulnier could not lift more than 10 pounds, Dr. Urbaniak was free to opine, based on the objective medical evidence before him, that Salerni's lifting limitation was "conservative" and that there was no objective support for such a limitation in the treatment records [Urbaniak] personally reviewed.[36] Additionally, although Dr. Urbaniak did not specifically endorse an exertional limitation for Saulnier, he noted the lack of objective record evidence supporting Saulnier's argument for greater exertional limitations.[37] For example, "with respect to the alleged lumbar impairment, [Urbaniak] testified that the only positive exam finding in the record was limited range of motion, which, in his opinion, d[id] not support [the] conclusion of 'severe' lumbar degenerative disc disease" reached by Dr. Salerni.[38]

Saulnier has failed to show that the ALJ's physical RFC assessment is not supported by other substantial evidence. As such, Saulnier has failed to prove that the ALJ erred by not assessing an RFC with greater physical restrictions.

### 3. Alleged failure to consider the record

At several points in his motion, Saulnier argues that the ALJ either misrepresented or failed to consider relevant parts of the record concerning his alleged carpal tunnel

---

[36] Admin. R. at 81.

[37] Id. at 72-97.

[38] Id. at 33 (citing Admin. R. at 72-97).

syndrome, degenerative disc disease, and complaints of dizziness.[39]  The court disagrees, finding that none of the "misrepresentations" identified warrant remand.

First, with respect to carpal tunnel syndrome, Saulnier contends that the ALJ erroneously represented that Saulnier's medical records contained "no evidence of [CTS] prior to the date last insured (DLI)," when Saulnier in fact had an EMG test in 2006 or 2007 showing severe CTS.[40]  This, however, does not constitute reversible error.  As Saulnier himself concedes, the copies of this test result were not available and thus not part of the record.  And although Dr. Salerni's notes show that he treated Saulnier for CTS symptoms in August 2013,[41] Dr. Salerni did not reference this visit in his physical RFC assessment.  Finally, during the relevant period, Saulnier never sought treatment for his CTS, did not wear a splint or brace, did not seek physical therapy, and sought no further diagnostic testing, such as an updated EMG.  See Perez Torres v. Sec'y of Health & Human Servs., 890 F.2d 1251, 1255 (1st Cir. 1989) (finding that an ALJ "was entitled to discount the severity of pain complaints" and "ability to perform" where a claimant sought no regular treatment for allegedly painful conditions).  Thus, even if the ALJ misread the record in stating absolutely that it held no medical evidence of CTS, this error is harmless because the record evidence as a whole reasonably and adequately

---

[39] Saulnier Mot. to Reverse Mem. at 2-5, 13-15.

[40] Id. at 2.

[41] See Admin. R. at 965 (treatment note substantiating a positive test for signs of carpal tunnel syndrome).

supports the ALJ's conclusion that Saulnier's CTS impairments were not severe, see id., and because the ALJ included CTS limitations in his RFC restrictions.[42]

Saulnier's arguments concerning the ALJ's consideration are similarly flawed with respect to his lumbar degenerative disc disease.  Saulnier asserts that the ALJ erred in finding that his "records do not reflect lumbar degenerative disc disease/spondylosis prior to the date last insured" because his records, in fact, contain an x-ray showing severe degenerative disc disease.[43]  But as Saulnier concedes, this x-ray was taken six months after the date last insured.  Additionally, Saulnier's doctors took this x-ray because he "aggravated his lumbar degenerative disc disease at L5-S1 after a fall a few weeks prior" to the x-ray, but still after the date last insured.[44]  Even though Saulnier "complained of back discomfort prior to" his date last insured, the medical records he cites do not reference lumbar pain or degenerative disc disease of the lumbar spine, severe or otherwise, during that timeframe.[45]  As such, the ALJ's representations were reasonably accurate with respect to the relevant time period.

The same is true concerning the ALJ's consideration, or purported lack thereof, of Saulnier's dizziness.  Under Social Security regulations:

> No symptom or combination of symptoms can be the basis for a finding of disability, no matter how genuine the individual's complaints may appear to be, unless there are medical signs and laboratory findings demonstrating the

---

[42] See Admin. R. at 24 ("[T]he undersigned has included limitations in the residual functional capacity assessment noted below for frequent handling and fingering in light of the reference of [Saulnier's] orthopedic doctor to the long-standing [CTS] condition . . . .").

[43] Saulnier Mot. to Reverse Mem. at 3-4 (citing Admin. R. at 24-25).

[44] Admin. R. at 25 (citing Admin. R. at 801).

[45] Saulnier Mot. to Reverse Mem. at 3-4 (citing Admin. R. at 510, 530, 964); see Admin. R. at 510, 530, 964).

existence of a medically determinable physical or mental impairment(s) that could reasonably be expected to produce the symptoms.

Social Security Ruling 96–7p, 1996 WL 374186 (July 2, 1996).  As the Commissioner notes, Saulnier has not pointed to medical evidence in the record establishing a medically determinable impairment for his purported dizziness.  Saulnier concedes that he "received a variety of diagnoses, causes and non-causes."[46]  Even Dr. Shilling's testimony, on which Saulnier relies, at best establishes that Saulnier's "hypoxic-ischemic event" <u>could</u> be a cause of Saulnier's dizziness.[47]

Despite the absence of a medically determinable impairment, the ALJ still considered Saulnier's testimony about his dizziness, as well as the supporting evidence, in assessing the RFC.  As summarized by the ALJ while assessing the combination of Saulnier's impairments: Saulnier's "[t]reatment notes show some position dizziness/vertigo reported, but records show only intermittent symptoms with most treatment for it occurring after the date last insured, and was not considered related to his cardiac condition after work up testing in March 2016."[48]  Additionally, the ALJ observed Dr. Shilling' opinion that Saulnier's "reported dizziness is unrelated to his cardiac condition, as evidence in the objective records."[49]  Saulnier's argument that the ALJ failed to consider his reported dizziness in combination with his other impairments is uncompelling.

---

[46] Saulnier Mot. to Reverse Mem. at 14.  For example, Dr. Suanyi opined in March 2015 that "I'm not sure as to the cause and I'm not entirely convinced that it has a primary neurological cause either."  Admin. R. at 556.

[47] <u>Id.</u> at 104-05 (responding "okay" to the leading questions of Saulnier's counsel).

[48] <u>Id.</u> at 31.

[49] Admin. R. at 33 (citing Admin. R. at 104).

**B.      Dr. Salerni's medical opinion**

Next, Saulnier argues that the ALJ erred by not giving controlling weight to the opinion of his treating physician, Dr. Salerni.  In Saulnier's view, "Dr. Salerni's opinion on the issue of the severity of [his] impairment [was] well-supported by medically acceptable clinical and laboratory diagnostic techniques."[50]  As such, Saulnier contends that the ALJ should have given Dr. Salerni's opinion controlling weight instead of relying on the opinion of Dr. Urbaniak, "a non-treating, non-examining medical witness who testified by phone; an orthopedic surgeon who has apparently not practiced since 1985."[51]  The court disagrees, finding that the ALJ provided sufficient "good reasons" for discounting Dr. Salerni's medical opinion.

Social Security regulations require that an ALJ evaluate every medical opinion in the record, regardless of its source.  See 20 C.F.R. § 404.1527(c).  In deciding the weight to give most medical opinions, an ALJ must consider several factors, including the nature of the medical source's relationship with the claimant, the consistency of the opinion with the other record evidence, and the medical source's specialty.  See id.  Under this framework, an ALJ must give the medical opinion of a treating source controlling weight if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  Id. § 404.1527(c)(2).  If the ALJ discounts a treating source's medical opinion, they must provide "good reasons" for the weight actually given, id., which "offer a rationale that could be accepted by a reasonable mind," Dimambro v. U.S. Soc. Sec. Admin., No. 16-cv-486, 2018 WL 301090, at *10 (D.N.H. Jan. 5, 2018) (Barbadoro, J.);

---

[50] Saulnier Mot. to Reverse Mem. at 12.

[51] Id.

accord Breitmaier v. Berryhill, No. 17-CV-706, 2018 WL 6696044, at *4 (D.N.H. Dec. 20, 2018) (McCafferty, C.J.).  In doing so, the ALJ "is not free to simply ignore medical opinions supporting a claimant's position, [but] she remains free to . . . accept each piece of evidence completely, partially, or not at all."  DiMambro, 2018 WL 301090, at *4 (internal citations omitted).

Here, the ALJ provided "good reasons" to depart from the treating physician rule and accord Dr. Salerni's opinion little weight.  As part of Saulnier's Social Security proceedings, Saulnier submitted two letters from Dr. Salerni opining on Saulnier's impairments.[52]  The ALJ found that the first letter was "conclusory" and "vague," as it cited "little objective evidence" to support the opinion that Saulnier was not functional, and did not "provide a function-by-function assessment of the claimant's ability to work."[53]  For the second letter, the ALJ noted that it failed to "cite to evidence in the record to support [Dr. Salerni's] conclusions" regarding Saulnier's functional limitations "and appear[ed] to be based mostly upon [Saulnier's] self-reported limitations."[54]  These suffice as good reasons for giving Dr. Salerni's opinion little weight.  See Haggblad v. Astrue, 2011 WL 6056889, at *12 (D.N.H. Nov.17, 2011) (holding that an ALJ "may reject a treating physician's opinion if it is based 'to a large extent' on a claimant's self-reports that have been properly discounted as incredible"), aff'd, 2011  WL  6057750) (Dec. 6, 2011); Remick v. Astrue, 2011  DNH 176, 2011 WL 5025315, at*10-11 (D.N.H. Oct. 21, 2011) (concluding that an ALJ properly rejected a treating source's opinion that

---

[52] See Admin. R. at 754, 797.

[53] Id. at 35.

[54] Id.

was not adequately explained and was inconsistent with other substantial evidence in the record).

Although Saulnier asserts that Dr. Salerni's opinion was "well-supported by medically acceptable clinical and laboratory diagnostic techniques,"[55] he has not pointed to any medical record or discussion (other than possibly citing Saulnier's self-reports) corroborating Dr. Salerni's recommended limitations.  In contrast, the ALJ, in her decision, observed how Dr. Salerni's opinion, which presumed severe functional limitations in Saulnier's lower extremities, was "inconsistent with the claimant's objective exams and testing, such as the MRI conducted January 2014 that looked 'quite good,' with no abnormalities of any sort in the discs above or below the fusion . . . , as well as normal neurological exams and normal musculoskeletal exams."[56]  As such, Saulnier has failed to show that the ALJ erred by discounting Dr. Salerni's medical opinion.

### C.      Weight given to Saulnier's subjective pain and disability

Saulnier next contends that the ALJ erred by improperly discounting subjective evidence of his pain and disability provided through his and his wife's testimony.  The ALJ found that while Saulnier's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," his statements "concerning the intensity, persistence, and limiting effects of these symptoms [were] not entirely consistent with the medical and other evidence of record."[57]  This determination was not erroneous.

---

[55] See Saulnier Mot. to Reverse Mem. at 12.

[56] Admin. R. at 35.

[57] Id. at 30.

"An ALJ determining whether an applicant has a residual functional capacity that precludes a finding of disability must evaluate the intensity and persistence of an individual's symptoms such as pain and determine the extent to which an individual's symptoms limit his or her ability to perform work-related activities." Coskery v. Berryhill, 892 F.3d 1, 4 (1st Cir. 2018) (internal quotation marks omitted). "Because a claimant's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone," social security regulations and rulings require that ALJs examine the entire case record, including the objective medical evidence, an individual's statements about the intensity, persistence, and limiting effects of symptoms, statements and other information provided by medical sources and other persons, and any other relevant evidence in the individual's case record. See 20 C.F.R. §§ 404.1529(c)(3) (setting forth the "Avery" factors), 416.929(c)(3) (same); SSR16-3p.

As discussed, the ALJ found that Saulnier's testimony about the severity of his symptoms and limitations—which Saulnier contends rendered him totally disabled—was not consistent with medical treatment notes and records from the period just before and following the relevant period (as identified in Step 1 of the ALJ's analysis).[58]  These records and notes include an MRI, which looked "quite good" and showed no abnormalities resulting from his neck fusion surgery,[59] and a follow up CT scan also showing "excellent fusions."[60]  The ALJ also observed that while Saulnier "reported worsening of his neck pain following a fall from a ladder in September 2014, his records

---

[58] Admin. R. at 30.

[59] Id. at 30 (citing Admin. R. at 510).

[60] Id. (citing Admin. R. at 511, 513).

showe[ed] that his treatment notes following the accident showed no reported neck pain or stiffness, was able to move his arms and hips without difficulty, and that he avoided major injury."[61]  The ALJ further observed that Saulnier's neurological and extremity exams were all normal.[62]

The ALJ made similarly detailed findings regarding the objective medical evidence on Saulnier's cardiac symptoms, mental health impairments, and cognitive orders.  For example, with respect to Saulnier's cardiac symptoms, the ALJ observed that in cardiac notes from July 2014 and January 2015 (following up on a 2013 myocardial infarction), Saulnier had stable symptoms, with no chest pain, dyspnea with exertion, orthopnea, or side effects of medications.[63]  For Saulnier's mental health, the ALJ found, as just one of many examples, that Saulnier's "mental status exams from the alleged onset date through the date last insured were normal, with normal mood and affect, and normal attention and concentration."[64]  And as to cognitive impairment, although Saulnier's "objective testing show[ed] some slowing in the processing information in testing, his verbal abilities were all good, as was his visual motor and visual perceptual abilities," and Saulnier was able perform some part-time property management work in 2015.[65]  See Bica v. Astrue, No. 11–CV–86, 2011 WL  5593155, at *14 n.8 (D.N.H. Nov. 17, 2011)

---

[61] Id. (citing Admin. R. at 523).

[62] Id. at 31 (citing Admin. R. at 519, 524, & 561).

[63] Id. (citing Admin. R. at 518-19).  Saulnier also denied "fatigue, lightheadedness, shortness of breath, palpitations, and swelling of the hands and feet."  Id. at 519.

[64] Id. at 31 (citing Admin. R. at 520, 525).

[65] Id. at 31-32 (citing Admin. R. at 540).  The Commissioner adds that in December 2015 (after his date last insured), Saulnier told one of his doctors that he was working "7 days a week." Admin. R. at 599.

(DiClerico, J.) ("[P]art-time work that is not substantial gainful activity may be considered to determine whether a claimant was able to do more work than she actually did.").

Finally, the ALJ found Saulnier's testimony on why he purportedly filed for disability to be inconsistent with medical record evidence documenting the progression of his impairments and his daily life activities.  The ALJ found the fact that Saulnier "did not file his application until December 2015, after his second heart attack," and "two and-one-half years" after his neck fusion surgery," to be "significantly . . . inconsistent" with his testimony that his neck pain was the main factor for filing for disability.[66]  In addition, the ALJ observed that medical records from Saulnier's doctor showed that Saulnier was still able to do activities of daily living independently, such as pay bills and grocery shop, after he fell from a ladder in September 2014, even though he and his wife testified that he was unable to do so.[67]

Saulnier attempts to rebut these findings by pointing to testimony in the record supporting the severity of his subjective symptoms under the Avery factors, see 20 C.F.R. §§ 404.1529(c)(3), which he contends the ALJ purportedly failed to evaluate.  This testimony includes that:

- "He and his wife testified that he could not shop alone, do the laundry, put away the clothes, cook, turn off the grill, or even remember to let the dog back in the house."[68]

---

[66] Id. at 32.

[67] Id. (citing Dr. Nichol's records generally)

[68] Saulnier Mot. to Reverse Mem. at 18 (citing Admin. R. at 63-65, 203-215).

- "If he went to the store with his family, he wandered, got confused and they had to find him."[69]

- "Due to his carpal tunnel he dropped things with such frequency that they switched to plastic cups with lids."[70]

- He has frequent panic attacks with heart palpitations; he must leave the situation for fear of doing something he'll regret."[71]

- These attacks were so common when he actually was having a MI, they thought it was just another panic attack."[72]

But Saulnier does not explain how this testimony about his daily life activities and subjective pain and impairments proves his argument that the RFC is not supported by substantial evidence from the record as a whole.  Bubar v. Astrue, No. 11-cv-107, 2011 WL 6937507, at *8 (D.N.H. Dec. 5, 2011) ("[T]he mere existence of evidence that supports a claimant's  position, or even a quantum of evidence sufficient to support a decision in a claimant's favor, is not enough to show that an ALJ's decision to deny a claim was not supported by substantial evidence.").  In contrast, the ALJ devoted several pages to her decision applying the Avery factors to the objective medical evidence gathered from providers from before and after the relevant period.  After considering Saulnier's "subjective complaints" about the alleged severity of his symptoms and

---

[69] Id. (citing Admin. R. at 204, 215, 216).

[70] Id. (citing Admin. R. at 68).

[71] Id. (citing Admin. R. at 69, 70, 211).

[72] Id. (citing Admin. R. at 482).  In addition to arguing that the ALJ considered this testimony, the Commissioner further contends that this and other testimony is inconsistent with what Saulnier actually reported to his providers.  See Comm'r Mot. to Affirm Mem. at 26-27 (citing Admin. R. 69, 482, 514-15, 528, 541, 571, 574, 576-581).

limitations, the ALJ ultimately found Saulnier's testimony to be inconsistent with the "totality of the objective evidence . . . as well as the medical records even after the date last insured."[73]  And despite this inconsistency, the ALJ still accepted that Saulnier had severe impairments and limited his residual functional capacity to a reduced range of light exertional work.

Accordingly, the ALJ properly followed the framework for assessing a claimant's subjective reports under SSR 16-3p.  The ALJ similarly did not err in discounting the testimony of Ann Saulnier for similar reasons.[74]  See Martin v. Colvin, No. 15-CV-40128, 2016 WL 5376316, at *11–13  (D. Mass. Aug. 3, 2016) (finding a spouse's testimony to be not credible where it mirrored the claimant's testimony and could not be "squared" with the claimant's medical history, "in which [nine] specialists returned normal and unremarkable results on numerous occasions").

### D.    Vocational expert

Saulnier's last argument on appeal focuses on the vocational expert's answers to the ALJ's Step 5 hypotheticals.  At Step 5, the ALJ assesses the claimant's RFC in combination with the "vocational factors of [the claimant's] age, education, and work experience," 20 C.F.R. § 404.1560(c)(1), to determine whether he or she can "engage in any . . . kind of substantial gainful work which exists in the national economy," 42 U.S.C. §§ 423(d)(2)(A), 1382a(3)(B).  The ALJ typically seeks to satisfy this burden, as the ALJ did here, by relying on the testimony of a vocational expert.  See Arocho v. Sec'y of Health & Human Servs., 670 F.2d 374, 375 (1st Cir. 1982).

---

[73] Admin R. at 32; see also id. at 30 ("The evidence of record reveals that the course of treatment and objective medical findings are not consistent with the claimant's alleged severity of symptoms and limitations.").

[74] See id. at 36.

Saulnier contends that reliance on the vocational expert's testimony constitutes reversible error for three reasons.  First, he argues that because his functional abilities are more limited than the RFC, the ALJ cannot rely on the vocational expert's answers allegedly flawed hypotheticals.  In essence, this argument amounts to a collateral attack on the ALJ's RFC determination—a determination that this court already found to be permissible.  See Pavlakos v. Comm'r of Soc. Sec., No. 17-CV-362, 2018 WL 3854790, at *4 (D.N.H. Aug. 14, 2018) (rejecting the argument that the ALJ erred by relying on a vocational expert's answers to hypothetical questions not reflecting the claimant's subjective limitations as a collateral attack on an ALJ's RFC determination). Accordingly, the ALJ "did not err in presenting a question based on that RFC to the vocational expert [or in] relying on the vocational expert's resulting testimony."  Id.

Second, Saulnier argues that the Medical-Vocational (Grid) Rule 201.14 dictated that the ALJ find Saulnier to be disabled because Saulnier's treating physician expert opined that Saulnier should lift no more than 10 pounds—the weight limit for sedentary work.  But as discussed above, the ALJ properly assigned Saulnier an exertional capacity for light work.  Grid Rule 201.14 therefore does not apply and does not mandate a finding of disabled.  See Dax v. Colvin, No.  1:15-CV-21, 2015 WL 9473405, at *3 (D. Me. Dec. 28, 2015) ("Section 201.14 applies only when the claimant's assigned RFC includes an exertional capacity for sedentary work.  The exertional capacity assigned to the plaintiff in this case is for light work.").

Finally, Saulnier contends that the ALJ's reliance on the vocational expert's testimony requires remand because the three jobs identified by the expert could not "be performed as described by the [ALJ's] hypothetical."  At the hearing, the ALJ asked the vocational expert if jobs existed in the national economy for a hypothetical worker with

the same age, education, and work experience as Saulnier, who was limited to light exertional work, that is, the ability to stand and walk up to six hours a work day.[75]  The expert testified that the hypothetical individual could perform the representative occupations of sorter (40,000 jobs nationally), usher (30,000 jobs nationally), and cashier (330,000 jobs nationally).[76]  The ALJ therefore concluded that Saulnier could perform significant, gainful work existing in the national economy.[77]

Saulnier does not dispute that the Dictionary of Occupational Titles (DOT) allows all three of these jobs to be performed at the light exertional level.  See DOT 222.687-014 (Sorter), 1991 WL 672131; DOT 344.677-014 (Usher), 1991 WL 672865; DOT 211.462-010 (Cashier), 1991 WL 671840.  Rather, he argues that the jobs of usher and cashier cannot be performed under the ALJ's hypothetical because, per the vocational expert's testimony on cross-examination, they can often require more than 6 hours of standing during a shift.  But even if Saulnier's argument regarding usher and cashier jobs had merit,[78] Saulnier has not shown that the ALJ failed to meet her Step 5 burden as to the

---

[75] Admin R. at 136.

[76] Id. at 137-38.

[77] Id. at 37-38.

[78] In the face of Saulnier's pointed cross-examination, the vocational expert conceded that these jobs would not be able to be performed if the hypothetical worker could not stand the entire day. The ALJ nevertheless determined that the expert's testimony "was consistent with the information contained in the Dictionary of Occupation Titles," because the DOT undisputedly lists usher and cashier as jobs that can be performed with light-work exertional restrictions.  See Admin. R. at 37; SSR 00-4p, 2000 WL 1898704, at *2 (Dec. 4, 2000) (acknowledging that an ALJ may rely on the DOT for information about national work requirements); 20 C.F.R. § 404.1566(d)(1) (stating that ALJs may take administrative notice of reliable job information from various publications, including the DOT); SSR  00-4p, 2000 WL 1898704, at *2 (Dec. 4, 2000) (acknowledging agency's reliance on DOT for information about national work requirements).

remaining job of sorter.  Despite Saulnier's arguments to the contrary, the ALJ found that that there was "no evidence to support greater limitations in functioning" beyond the RFC's limitation to "frequent handling and fingering."[79]  For these reasons, the ALJ did not err in relying on the vocational expert's testimony.

## IV.   <u>Conclusion</u>

In sum, none of the findings or credibility determinations identified by Saulnier constitute an error warranting reversal or remand of the ALJ's disability decision.  The court therefore denies his motion to reverse[80] and grants the Acting Commissioner's motion for an order affirming its disability insurance benefits decision.[81]  The clerk shall enter judgment accordingly and close the case.

**SO ORDERED.**

Joseph N. Laplante
United States District Judge

Dated:  May 5, 2020

cc:    Elizabeth R. Jones, Esq.
       Paul K. Nitze, Esq.

---

[79] <u>Id.</u> at 24

[80] Doc. no. 7.

[81] Doc. no. 9.

28